YEE CHUNG v. UNITED STATES. *

(Circuit Court of Appeals, Ninth Circuit.   May 28, 1917.)

No. 2799.

1. ALIENS ☞32(8)—PROCEEDINGS TO DEPORT—WEIGHT AND SUFFICIENCY OF
EVIDENCE.
   In a proceeding to deport a person of Chinese descent, evidence *held*
sufficient to support his claim that he was a native-born citizen of the
United States.
   [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 84.]

2. ALIENS ☞32(8)—PROCEEDINGS TO DEPORT—WEIGHT AND· SUFFICIENCY OF
EVIDENCE.
   In a proceeding to deport a Chinese person, the court could not arbitra-
rily and without reason reject or discredit the testimony of witnesses
favorable to the defendant, on the ground that they were Chinese persons
and unworthy of credit.
   [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 84.]

Appeal from the District Court of the United States for the South-
ern Division of the Southern District of California; Benj. F. Bledsoe,
Judge.

Proceeding by the United States to deport Yee Chung.   From an or-
der affirming an order of deportation, the defendant appeals.   Re-
versed and remanded, with directions.

John L. McNab, of San Francisco, Cal., and Isidore B. Dockweiler,
of Los Angeles, Cal., for appellant.

Albert Schoonover, U. S. Atty., and J. Robert O'Connor and Clyde
R. Moody, Asst. U. S. Attys., all of Los Angeles, Cal.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge.   The appellant was found by a commissioner
of the United States to be unlawfully in this country and ordered de-
ported to China, which order was, on hearing upon a writ of habeas
corpus, affirmed by the court below.   He claims to have been born in
the United States of parents of Chinese descent, who, at the time of
his birth, were subjects of the emperor of China, having a permanent
domicile here and being engaged in business, and, therefore, that he
is a citizen of the United States.   It was said by Judge Holt in the
case of United States v. Leu Jin (D. C.) 192 Fed. 580, that it is im-
possible in such cases "to be sure what the truth is," in which case,
nevertheless, he reversed the order of deportation made by the com-
missioner, pointing out the insufficiency of the various inconsistencies
relied upon by the government to overcome the evidence given that
the defendant was born in this country.   In the case of Pang Sho Yin
v. United States, 154 Fed. 660, 83 C. C. A. 484, the Circuit Court of
Appeals for the Sixth Circuit reversed the judgment of the District
Court, which had affirmed an order of deportation made in a similar
case by the commissioner, based on the immigration inspector's ex-
amination of the respondent, his answers to questions put to him on
such examination, "and the testimony of the inspectors that at the

time they seized the respondent at Ecorse he was coming from the direction of the Detroit river, in company with three other persons, one of whom was a Chinese person, and the other two white men." In the inspector's examination, said the court:

"The respondent stated that he was 34 years old; that he was born in San Francisco; that his father's name was San Foy, and his father died when the respondent was quite young; that he went to China when he was 4 years old; that he had lived there until his recent return to this country; that his occupation there was farming; that when he returned he landed in Vancouver, British Columbia, and paid a head tax there of $500; that he had been in various parts of Canada; that he left Windsor at 10 o'clock the evening before his arrest by the inspectors, and came across the Detroit river in company with the other three persons mentioned by the inspectors; and that he was then on his way to Paducah, Ky., where he had a relative. This account might fairly excite suspicion, but it was not irreconcilable with the supposition that on his return to America he had no clear ground for expecting that he could prove his birth in the United States, and establish his identity and right to entrance here, and that he did not intend to rely upon the fact of his birth in the United States. But several persons have been found and produced as witnesses whose veracity is vouched for by their neighbors, who swear to the circumstances of his nativity in San Francisco and his going to China when quite young, all as stated by him. One of these states the name of the street in San Francisco where the father lived and the respondent was born, and the month and year of the event, and he then knew the father and son; that he (the witness) afterwards saw the respondent in China, when the latter was 10 years old, and now recognizes him as the same person. The identification of the appellant by the witness as the child of their acquaintance in San Francisco is so positive that we cannot feel justified in disregarding it when the consequences are so serious as the possible (and we think probable) expulsion from his native country of one who is entitled to share the birthright of citizenship. We think the judgment and order of the District Court should be reversed, and the appellant discharged."

See, also, United States v. Chin Len, 187 Fed. 544, 109 C. C. A. 310; Woo Jew Dip v. United States, 192 Fed. 471, 112 C. C. A. 609.

[1] In the present case the appellant claims to have been born February 17, 1880, at 728 Sacramento street, San Francisco, where his father and mother at the time resided, the former being then bookkeeper for and a member of the firm of Quong Woh Chong; that in 1881 his father took his mother and himself (then about 2 years old) to China, where his father remained several months, and then returned to San Francisco, leaving the appellant in China with his mother; that appellant remained there until he was about 18 years old; that he married in China, and had one son born to him there July 5, 1897, and another born there after his return to this country; that in the latter part of December, 1897, he came back to the United States by way of Vancouver, British Columbia, going thence to Montreal, and from there to Burlington, Vt., where he was arrested on the charge of being unlawfully in this country, and after examination by a United States commissioner was discharged by that officer; that his father, some time after his return to the United States, sold his business interest in San Francisco and went to Boston, where he entered the merchandise store of Sam Sing; that when the appellant was arrested in Burlington his father went from Boston to Burlington and was a witness at his examination, and after his discharge appellant went to Boston with his father, where he remained a few days, when the latter

sent him to a laundryman named Yee Lee at Carnegie, Pa., for whom he worked about 10 years; that at the end of that time appellant went back to China, sailing from Seattle some time in February, 1907; that before leaving Carnegie for Seattle he procured a copy of the proceedings had before the commissioner at Burlington, to which he annexed his affidavit, containing his photograph, which affidavit stated the time and place of his birth in San Francisco, the names of his Chinese parents, the place of his then residence in Allegheny county, Pa., and his discharge by the commissioner at Burlington, Vt., on the ground that he was a native-born citizen of the United States, and which affidavit has this indorsement:

"We, the undersigned, citizens of Allegheny county, Pa., other than Chinese, are acquainted with the above-described affiant, Yee Chung, and believe his statement as herein set forth to be true.
                    "E. R. Donehoo, Presbyterian Minister.
                    "Herbert F. Johns, Banker."

The foregoing papers the appellant testified he submitted to the government official at Seattle before sailing for China, and upon which papers the latter indorsed the following:

"Identified on departure, this Feb. 17, 1907.
                    "J. V. Stewart, Chinese Inspector."

The appellant further testified, among other things, that he is the same Yee Chung named in those papers, and that when he landed in Hong Kong he went back to the village of Chung Doey, in the Sun Ning district, where his home was; that he remained in China until about October, 1909, when he returned to the United States by the steamship Manchuria, arriving at the port of San Francisco November 12, 1909. It is significant that upon this second return of the appellant to this country, and while his right to enter the United States was under consideration, his application was thus reported on:

                                        "December 13, 1909.
"Inspector in Charge, C. D. I. S., San Francisco, Cal.:
    "In re Yee Chung, native, C. R. 47 Manchuria, 11/12/09, I have to report as follows:
    "This applicant presents a transcript of a record of Commissioner Johnson, district of Vermont, without a photograph attached, showing that a Chinaman by the same name was discharged by said commissioner January 19, 1897. The ground of the discharge is not shown, but in view of the fact that it appears that the respondent in that case entered the United States at Richford, Vt., and was subsequently taken to Burlington, where he was discharged by Commissioner Johnson, I am satisfied that he was discharged on the ground of birth in the United States, because, had he set up any other claim, such claim would have been investigated at the port of Richford.
    "According to the report of the inspector in charge at Richford, dated November 26, 1909, there is no testimony in Commissioner Johnson's records of the cases at the time of the discharge of said respondent, and the commissioner's records consist simply of the docket entries, complaint, warrant, etc. By the telegram of the inspector in charge at Richford, dated December 19, 1909, in reply to telegram of this office of December 7, 1909, it appears that the transcript of the record presented by this applicant is genuine.
    "Considering the lapse of time the applicant claims to have been arrested and discharged by Commissioner Johnson, I am reasonably satisfied from his examination that he is the respondent, Yee Chung, discharged by Commissioner Johnson, January 19, 1897. Although he claims that he distinctly re-

members the commissioner who discharged him, and the description he has given of said commissioner by no means shows him to have been Commissioner Johnson, I think it would be unreasonable to hold the applicant too strictly to this description, in view of the 12 years that have elapsed since his alleged discharge.

"In view of the foregoing, I recommend landing. All papers herewith.

"Respectfully,                    Chas. D. Mayer, Chinese Inspector."

The appellant being admitted, he further testified that from San Francisco he went to Homestead, Pa.; that in 1913 he had his two sons, the name of the elder of whom is Yee Wah, and the younger Lee Lai, brought to this country, entering at San Francisco, having sent them "a paper for him to come." Certificates of identity of these two boys, each containing a photograph and the certificate of his admission, were introduced in evidence; that of Yee Wah having also this indorsement:

"12720/8–17.                    "Memo. for the Commissioner.

"In re Yee Wah, alleged Son of a Native.                    "July 1, 1913.

" * * * The alleged father claims to have returned to the United States from China by Vancouver, B. C., ex SS. Empress of China, K. S. 23–11 (November or December, 1897), and to have immediately proceeded to the United States via Montreal and Richford, Vt. He presents court record of discharge No. 121, issued in his name, by the District Court of Vermont. The alleged father, it will be noted, was landed at this port No. 47 Manchuria, November 12, 1909, by virtue of his previous landing by Commissioner Johnson January 19, 1897. Manifestly the examining inspector is not satisfied that the essential trip has been absolutely verified, but in my opinion the prior landing record No. 47 contains sufficient evidence to show that the alleged father in the present case is the identical person landed by the court in 1897. Accordingly, the essential trip is verified and I recommend admission.

"A. W. Long, Inspector, Law Division, Pittsburg, Pa.

" * * * The alleged father Yee Chung, of his coming and now detained alleged son, Yee Wah, stated his testimony in a candid and frank way, corroborating all of his alleged son's statements in a most minute manner, so that I feel impressed that the truth was told. The witness Yee Wing also made a statement which corresponds in its entirety to all testimony given by Yee Wah. On account that all testimonies were given in such a frank way and corroboratively implying the truth, I think I feel justified to ask a favorable consideration concerning the admission of Yee Wah.

"[Signed] B. B. Marheineke, Investigating Interpreter."

The appellant further testified that after his sons arrived in San Francisco he put them in school in Pittsburg, where they still were at the time of his testimony.

The claim of the appellant to birth in the United States is corroborated by the testimony of seven other witnesses, one of whom is a white man and six Chinese persons. Of the latter, one was for about 25 years in the personal service of a Commissioner of Immigration of the United States, and the other five have been for many years prominent Chinese merchants of the city of San Francisco. In their testimony they specify various incidents in the appellant's life, both in the United States and in China, which, if true, leave no doubt whatever respecting appellant's birth as claimed. In rejecting the testimony of all the Chinese witnesses, the trial judge, in the opinion filed by him in the court below, said:

"I had occasion, in an oral opinion delivered in this court, late in January of last year, in the case of United States v. Jee Jan, to indicate my views as

to the amount of evidence that ought to be produced in behalf of a person of Chinese descent, in one of these deportation cases, in order that the requirement of the statute that the court should be satisfied might be had, and I see no reason to depart from the views there announced. The burden, I believe, is placed by the statute upon the defendant, and he must by the evidence adduced in his behalf 'satisfy' the court—i. e., produce moral certainty or conviction (C. C. P. § 1835)—of the truthfulness of his claim (186 U. S. 193 [22 Sup. Ct. 891, 46 L. Ed. 1121])."

The previous opinion of the learned judge thus referred to by him is printed in the brief of the attorney for the government, where he says, among other things:

"In this connection I am perfectly free to admit that with me there is always a good deal of dubiousness about the testimony of Chinamen in any case. Experience has shown that many of them have little, if any, regard for an oath administered to them in a court of justice in our country; and experience has shown that Chinese, in their relations among themselves and for the purpose of protecting one another in various ways and exigencies, think it is not at all beyond their province to color, if not actually to manufacture, their testimony, in that a given end may be accomplished thereby, and the mere fact that a Chinaman testifies to a thing does not, in my mind, because of my experience in such matters, prove to me that the fact is as testified to. It needs to be measured with the probabilities and improbabilities; it needs to be considered in relation to the interest of the Chinaman thus to testify and the reasons why it might be to his interest to testify one way as opposed to another—all of the time taking into consideration the fact, which I believe to exist, as it is commonly known and understood among those whose duty it is to administer and construe the laws, and who have to do with courts of justice, that the Chinese, as a race, when called upon in a matter in which Chinese are vitally interested, are disposed to be very free in their statements upon the witness stand."

[2] We are unable to approve the views thus expressed. To the contrary, this court said in the case of Woey Ho v. United States, 109 Fed. 888, 48 C. C. A. 705:

"A court is not at liberty to arbitrarily and without reason reject or discredit the testimony of a witness upon the ground that he is a Chinaman, an Indian, a negro, or a white man. All people, without regard to their race, color, creed, or country, whether rich or poor, stand equal before the law. It is the duty of the courts to exercise their best judgment, not their will, whim, or caprice, in passing upon the credibility of every witness. The question whether a witness is credible must ordinarily be determined by the tribunal before whom the witness appears, and in the decision of which that tribunal must necessarily be vested with a very wide discretion. In weighing the scales, the conduct, manner, and appearance of the witness, as seen by that tribunal, often forms an important factor in enabling courts, as well as juries, to determine whether or not the witness is entitled to credit."

We see but little, if any, force in the circumstances or inconsistencies in the evidence referred to in the opinion of the court below. One of those circumstances is that, when the appellant was examined before the commissioner of the court, he was shown a photograph, and was asked whether he recognized it as a picture of any one he knew, to which his answer was, "No." On a subsequent examination before the court, the same photograph was shown the witness, when he said:

"This looks more like my father, a resemblance to my father's picture, but it is not in the other one. Q. You say this is a different picture, then, than was shown to you in the hearing before Mr. Williams, the commissioner? A. It don't appear to me to be the same. Q. That picture didn't look like your

father looked when you saw him in Boston after you went down from Burlington, Vt.—the picture that was shown to you before the commissioner? A. No. Q. And this picture does look like your father looked at that time? A. There was some resemblance of my father, but not exactly. Q. This? A. Yes. Q. Ask him how his father differed from that in appearance. A. He was not so fleshy at that time."

Another of the inconsistencies referred to by the trial court is that, when the appellant arrived at Vancouver, in December, 1897, his name was asked by the Chinese interpreter, and later he stated that it was not; that his ticket was purchased at Hong Kong through to Boston, which ticket he showed at Vancouver, and afterwards that the ticket was purchased only to Montreal, and that his ticket from Montreal to Boston was furnished him by his father.

When it is remembered that all of those matters occurred nearly 20 years ago, we think that such inconsistencies are of but little moment. So, too, as respects the appellant's recollection of the personal appearance of the commissioner before whom he claims to have been examined and discharged in Vermont in 1898. The further circumstances, referred to by the court below, that when the appellant was arrested in Los Angeles he claimed to have a "native paper," may, we think, in view of the record in the case, be well taken to mean the order for his discharge made by the commissioner in Vermont. The only other circumstance referred to in the opinion of the court as being against the appellant grows out of the testimony of the witness Jolliffe, whose testimony was of such a character as to throw no light respecting the truth of the appellant's claim. Looking at the entire record, we are of the opinion that it is sufficient to show that the appellant is a native-born citizen of the United States, as claimed by him.

Accordingly, the judgment is reversed, and the cause remanded, with directions to the court below to direct his discharge.